IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Joseph Edward Poston, | ) | C/A No.: 1:17-345-MBS-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Nancy A. Berryhill, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.      Relevant Background

A.      Procedural History

On April 19, 2013, Plaintiff protectively filed applications for DIB and SSI in which he alleged his disability began on March 30, 2013. Tr. at 339–47 and 348–53. His

applications were denied initially and upon reconsideration. Tr. at 277–81, 285–86, and 287–88. On May 20, 2015, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Thomas G. Henderson. Tr. at 175–98 (Hr'g Tr.). The ALJ issued an unfavorable decision on June 15, 2015, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 149–74. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on February 6, 2017. [ECF No. 1].

B.  Plaintiff's Background and Medical History

1.  Background

Plaintiff was 36 years old at the time of the hearing. Tr. at 178. He completed high school. *Id.* His past relevant work ("PRW") was as a bookkeeper and an assistant director of pharmacy services. Tr. at 195. He alleges he has been unable to work since March 30, 2013. Tr. at 339.

2.  Medical History

a.  Evidence Presented to ALJ

Plaintiff developed necrotizing pancreatitis in April 2010, secondary to gallstones. Tr. at 661. He was subsequently diagnosed with a pseudocyst as a complication of necrotizing pancreatitis and underwent open cystogastrostomy in June 2010. *Id.* He required a secondary suture in September 2011 because of delayed wound healing. *Id.*

Plaintiff presented to the emergency room ("ER") at Carolinas Hospital System ("CHS") on February 9, 2012, with moderately-severe left upper quadrant pain, nausea, and vomiting. Tr. at 665. John Wolford, M.D. ("Dr. Wolford"), observed Plaintiff's abdomen to be soft and slightly protuberant and noted mild left upper quadrant tenderness. Tr. at 666. He stated Plaintiff's pain likely resulted from a new pseudocyst. Tr. at 667. He did not suspect Plaintiff had "pancreatitis per se," but indicated "the redevelopment of the pseudocyst suggests there may be a ductular abnormality that may need to be corrected." *Id.* He stated Plaintiff would need drainage of the duct if his symptoms continued and surgical resection if he had a stricture. *Id.*

Plaintiff was admitted to CHS for abdominal pain, nausea, and vomiting on February 24, 2012. Tr. at 661. Badri Giri, M.D. ("Dr. Giri"), indicated Plaintiff had a history of hypertension, hyperlipidemia, anxiety, and polycystic kidney disease. *Id.* He stated Plaintiff had presented to his clinic earlier in the day with vomiting and increased abdominal pain that failed to respond to Dilaudid. *Id.* He observed Plaintiff to be tender at the upper epigastric region. Tr. at 662. An abdominal computed tomography ("CT") scan revealed a residual tiny fluid collection, calcification of an area of speculated scar tissue; splenomegaly; a four-millimeter cyst in the liver; numerous renal cystic lesions; and two small ventral abdominal wall hernias. Tr. at 681–82. Robert Garris, M.D. ("Dr. Garris"), examined Plaintiff and determined that the pseudocyst was too immature to drain. Tr. at 664. Dr. Giri indicated Plaintiff's pain did not seem proportionate to the size of the pseudocyst, but might be exacerbated by its position. *Id.* He discharged Plaintiff on

February 29, 2012, with a prescription for two milligrams of Dilaudid, every four hours, as needed, and instructed him to follow up with a gastroenterologist and a surgeon. *Id.*

On March 6, 2012, Plaintiff complained of abdominal pain and nausea that had rendered him unable to work. Tr. at 588. John Bennett Martinie, M.D. ("Dr. Martinie"), assessed a persistent pseudocyst and possibly disconnected pancreatic stump in the splenic hilum. Tr. at 590. He discussed the risks of completion distal pancreatectomy and splenectomy, and Plaintiff elected to proceed with the surgery. *Id.* Dr. Martinie noted that the fact that Plaintiff had not requested narcotic pain medications had "reinforce[d] my belief that he truly is symptomatic." *Id.* He believed that Plaintiff would benefit from surgery. *Id.*

On March 28, 2012, Plaintiff underwent an open pancreatic cystogastrostomy. Tr. at 587. He had no surgical complications and was discharged home on April 4, 2012. *Id.*

Plaintiff presented to Alan Barrett, PA-C ("Mr. Barrett"), for anxiety on June 25, 2012. Tr. at 550. He complained of depressed mood, difficulty falling asleep, diminished interest and pleasure, being easily startled, worrying excessively, decreased appetite, racing thoughts, restlessness, headache, and irritability. *Id.* Mr. Barrett noted no abnormalities on physical examination. Tr. at 552–53. He authorized a refill of Klonopin and referred Plaintiff for lab work. Tr. at 553.

On July 16, 2012, David Culpepper, M.D. ("Dr. Culpepper"), indicated Plaintiff's impairments included stable hypertension, mild gastroesophageal reflux disease ("GERD"), stable hyperlipidemia, mild chronic pancreatitis, and anxiety with good response to medication. Tr. at 545. He administered a B12 injection and prescribed

Cozaar and Toprol XL for hypertension; Klonopin and Lexapro for anxiety; Prilosec for GERD; Zocor for hyperlipidemia; and Nicotrol and nicotine patches for smoking cessation. Tr. at 546.

On December 28, 2012, Plaintiff reported that Dilaudid was too strong. Tr. at 544. Dr. Culpepper prescribed Tramadol to be used as needed. *Id.*

On January 4, 2013, Plaintiff reported that Tramadol was not helping to control his pain. Tr. at 536. Dr. Culpepper observed Plaintiff to have a protuberant abdomen and central abdominal tenderness. Tr. at 539. He prescribed pancreatic enzymes and referred Plaintiff for pain management and evaluation of sleep disturbance. Tr. at 540.

Plaintiff presented to Patrick Honaker, M.D. ("Dr. Honaker"), for a pain management consultation on January 24, 2013. Tr. at 577. He reported a history of chronic pancreatitis that caused him to experience aching, constricting, knifelike, sharp, and throbbing abdominal pain. *Id.* He indicated he was taking two milligrams of Dilaudid twice a week, but did not take the medication more often because he could not take it while he was working. Tr. at 579. Dr. Honaker observed that Plaintiff's abdomen was mildly tender to palpation and had multiple surgical scars. Tr. at 578. He refilled Plaintiff's prescription for Dilaudid. Tr. at 579. He explained a controlled substances agreement, and Plaintiff agreed to the terms. *Id.* Dr. Honaker authorized Plaintiff to receive 60 pills and instructed him to follow up in six months. *Id.*

In a letter dated February 11, 2013, R. Joseph Healy, M.D. ("Dr. Healy"), informed Dr. Culpepper that Plaintiff's sleep was non-productive and that he suffered from excessive daytime sleepiness. Tr. at 560. He noted that Plaintiff had lost a good bit

of weight and that his snoring had improved with the weight loss. *Id.* He explained that polysomnography showed Plaintiff to have some early rapid eye movement ("REM")-related obstructive sleep apnea ("OSA"); to sleep predominantly in superficial sleep stages; and to have periodic limb movements of sleep ("PLMS"). *Id.* He prescribed two milligrams of Requip XL and recommended that Plaintiff continue to lose weight. Tr. at 560.

Plaintiff presented to the ER at McLeod Regional Medical Center ("MRMC") on March 12, 2013, for left lower quadrant abdominal pain, nausea, and vomiting. Tr. at 508. Lab tests were negative. Tr. at 509. The attending providers administered medication for pain and nausea and discharged Plaintiff with instructions to follow up with his physicians and to return if he continued to experience pain, vomiting, or other concerns. Tr. at 509 and 512.

Plaintiff returned to the ER the next day. Tr. at 489. He stated he had been unable to control his pain with prescribed medications. *Id.* The attending physician observed Plaintiff to have epigastric tenderness, guarding, and hyperactive bowel sounds. Tr. at 493. A CT scan was consistent with postoperative partial pancreatectomy with mild inflammation stranding near the splenic hilum; unremarkable small bowel anastomosis; and multiple bilateral renal cysts that were consistent with polycystic kidney disease. Tr. at 496–97. The attending physician diagnosed chronic pancreatitis and abdominal pain and prescribed Dilaudid and Zofran. Tr. at 497–98.

Plaintiff followed up with Dr. Culpepper on March 20, 2013. Tr. at 533. He complained that he was experiencing constant left quadrant pain that was exacerbated by

work-related stressors. *Id.* He reported decreased appetite and nausea. Tr. at 534. Dr. Culpepper observed Plaintiff to appear ill and anxious and to have a protuberant abdomen, hypoactive bowel sounds, and left upper abdominal tenderness. *Id.*

Plaintiff followed up with Dr. Martinie on March 26, 2013. Tr. at 585. He reported intermittent abdominal pain and chronic nausea. *Id.* Dr. Martinie indicated Plaintiff's most recent CT scan showed no new fluid collection or other abnormality that would necessitate further surgery. *Id.* He observed Plaintiff to be "somewhat pale looking." *Id.* He had "a long frank discussion" with Plaintiff "about the lifelong debilitating pain that often accompanies these types of pancreatitis." *Id.* He expected that Plaintiff might be applying for disability and indicated he would "enthusiastically support" that decision. *Id.* He recognized a need to balance Plaintiff's "need for adequate pain control" and "the potential for addiction" to narcotic pain medications. Tr. at 586.

Plaintiff followed up with Dr. Honaker on April 1, 2013. Tr. at 574. He reported severe and worsening abdominal pain. *Id.* He indicated he was taking Dilaudid more often than he had anticipated and had only 15 pills remaining. Tr. at 576. Dr. Honaker observed Plaintiff's abdomen to be soft and mildly tender to palpation. Tr. at 575. He authorized Plaintiff to receive 45 additional Dilaudid tablets. *Id.*

Plaintiff presented to gastroenterologist Palmer M. Kirkpatrick, Jr., M.D. ("Dr. Kirkpatrick"), for recurrent pancreatitis on April 9, 2013. Tr. at 521. Dr. Kirkpatrick noted that Plaintiff had been hospitalized repeatedly for biliary tract disease and was continuing to experience abdominal pain. *Id.* He observed generalized abdominal tenderness and multiple scars and noted that Plaintiff weighed 244 pounds. Tr. at 522–23.

He diagnosed chronic pancreatitis and suspected chronic pain syndrome and prescribed Bentyl 20 mg. Tr. at 523. He stated "[t]his unfortunate man has recurrent severe pancreatitis with sever[e] pseudocyst formation most likely due to biliary tract disease (no ETOH) history. My concern at present is that he may be developing, or already has chronic pain syndrome. He mentioned he is trying to get on disability." Tr. at 523–24.

Plaintiff complained of fatigue, abdominal pain, decreased appetite, and nausea on April 15, 2013. Tr. at 530–31. Dr. Culpepper observed surgical scars and central abdominal tenderness. Tr. at 531. He prescribed Requip XL for restless leg syndrome and refilled Plaintiff's other medications. Tr. at 531–32.

Plaintiff presented to the ER at CHS on May 4, 2013, with generalized abdominal pain. Tr. at 606. The attending physician observed moderate tenderness to palpation in the periumbilical region of Plaintiff's abdomen. Tr. at 607. He diagnosed a urinary tract infection and acute abdominal pain. Tr. at 608.

On May 14, 2013, Plaintiff indicated he was tolerating Requip XL and that his sleep had greatly improved. Tr. at 558. He indicated he was feeling refreshed when he woke. *Id.* Dr. Healy authorized a 90-day refill. Tr. at 559.

Plaintiff followed up with Dr. Honaker for a recheck of abdominal pain on May 31, 2013. Tr. at 571. Dr. Honaker observed Plaintiff's abdomen to be mildly tender to palpation, but noted no other abnormalities on physical examination. Tr. at 572. He refilled Dilaudid. *Id.*

Plaintiff presented to Peter O'Kelly ("Dr. O'Kelly"), for enlarged prostate, chronic pancreatitis, and polycystic kidney disease on June 12, 2013. Tr. at 728. Dr. O'Kelly

noted no abnormalities on genitourinary examination, but a urinalysis showed trace blood and a glucose reading of 100 mg/dL. Tr. at 730. He diagnosed a urinary tract infection and prostatitis and prescribed Flomax. Tr. at 731.

Plaintiff presented to the ER at CHS on July 5, 2013, with pain in his lower back and pancreas. Tr. at 634. An abdominal CT scan showed no significant change. Tr. at 677–78. The attending physician observed Plaintiff to be in mild distress and to be mildly tender to palpation in the epigastrum and bilateral upper abdominal quadrants. Tr. at 635. He diagnosed acute pancreatitis and prescribed medication for nausea. *Id.*

Plaintiff was hospitalized at CHS on July 7, 2013, for persistent abdominal pain, nausea, and vomiting. Tr. at 689. His blood sugar was 430. *Id.* He was treated for volume depletion, persistent hyperglycemia, and pancreatitis. Tr. at 691. The attending physician prescribed Metformin. *Id.* He discharged Plaintiff on July 9, 2013, with instructions to test his blood sugar daily and to share his readings with Dr. Culpepper during his next visit. *Id.*

Plaintiff followed up with Dr. Culpepper on July 17, 2013, for hypertension, hyperlipidemia, diabetes, and enlarged prostate. Tr. at 704. He endorsed nausea, change in appetite, and markedly diminished interest or pleasure. Tr. at 706. Dr. Culpepper observed Plaintiff to be "chronically ill-appearing" and to have a compensated gait, hypoactive bowel sounds, and a protuberant abdomen. Tr. at 706–07.

Plaintiff presented to Krista Kozacki, M.D. ("Dr. Kozacki"), on July 26, 2013, for urinary tract infection, chronic pancreatitis, and diabetes mellitus. Tr. at 700. Dr. Kozacki observed Plaintiff to have slight abdominal tenderness in his left upper abdominal

quadrant and mid-pelvis. Tr. at 702. She assessed acute prostatitis, dysuria, and constipation; prescribed an antibiotic; and instructed Plaintiff to hydrate and to use Metamucil or fiber powder. Tr. at 700.

Plaintiff complained of constant, sharp, and aching abdominal pain on July 30, 2013. Tr. at 863. Dr. Honaker observed Plaintiff's abdomen to be mildly tender to palpation. Tr. at 864. He acknowledged that Plaintiff had developed diabetes, secondary to pancreatitis. Tr. at 865. He stated Plaintiff's pain was stable and refilled his prescription for Dilaudid. *Id.*

On August 7, 2013, Dr. O'Kelly noted no abnormalities on genitourinary examination. Tr. at 725. He prescribed Cipro for prostatitis. Tr. at 726.

On August 12, 2013, state agency consultant Olin Hamrick, Ph.D. ("Dr. Hamrick"), reviewed the evidence and completed a psychiatric review technique form ("PRTF"). Tr. at 204–05. He considered Listings 12.04 for affective disorders and 12.06 for anxiety-related disorders and found that Plaintiff's mental impairments were non-severe because he had only mild restriction activities of daily living ("ADLs"), mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. *Id.* A second state agency psychological consultant, Kathleen Broughan, Ph.D. ("Dr. Broughan"), reviewed the records and indicated similar findings on the PRTF. Tr. at 236–37.

On August 19, 2013, Plaintiff indicated acute prostatitis and constipation were improved. Tr. at 768. Dr. Culpepper noted diabetes was uncontrolled, but stated Plaintiff's insulin resistance should respond to nutritionist-supervised weight loss. *Id.* He

noted Plaintiff's umbilical hernia had been asymptomatic since his hospital stay, but indicated he would refer Plaintiff to a surgeon, as needed. *Id.* He stated Plaintiff continued to be disabled as a result of pain secondary to chronic pancreatitis, but indicated his office was not equipped to perform a true functional capacity assessment. *Id.*

On September 17, 2013, Plaintiff complained of new-onset nausea since starting Metformin. Tr. at 773. He reported severe, constant, and poorly-controlled symptoms of chronic pancreatitis. *Id.* Dr. Culpepper observed Plaintiff to be chronically ill-appearing. Tr. at 775. He instructed Plaintiff to take 500 mg of Metformin with dinner and to start Actos for diabetes. Tr. at 773. He changed Plaintiff's dosage of Ropinirole from extended-release to fast-acting. *Id.*

Plaintiff followed up with Dr. Honaker the same day and reported constant, sharp, and aching abdominal pain. Tr. at 860. Dr. Honaker indicated Plaintiff's abdomen was mildly tender to palpation. Tr. at 861. He declined to increase Plaintiff's medication dosage and recommended that he try interventional procedures to address his pain. *Id.* Tr. at 862.

Plaintiff presented to Harriet Steinert, M.D. ("Dr. Steinert"), on September 20, 2013, for a consultative examination. Tr. at 710. Dr. Steinert noted Plaintiff was 5'9" tall and weighed 269 pounds. Tr. at 711. She observed Plaintiff to walk into the room without an assistive device and to climb on to the examination table without assistance. *Id.* She indicated Plaintiff was neatly groomed, had a normal affect, and was able to provide a good medical history. *Id.* She noted Plaintiff's abdomen was "soft, obese and tender to

palpation over the area of the tail of the pancreas." Tr. at 712. She indicated no impairments to Plaintiff's vision, hearing, neck, cardiovascular system, respiratory system, extremities, orthopedic system, or neurological system. Tr. at 711–13. She diagnosed morbid obesity, hypertension, dyslipidemia, diabetes, polycystic kidney disease, and chronic pancreatitis with pancreatic pseudocyst formation and stated Plaintiff was limited by recurrent bouts of pancreatitis. Tr. at 713.

State agency medical consultant Jean Smolka, M.D. ("Dr. Smolka"), reviewed the evidence and completed a physical residual functional capacity ("RFC") assessment on October 1, 2013. Tr. at 206–09. She found that Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally crawl, crouch, kneel, stoop, and climb ramps and stairs; frequently balance; and should avoid concentrated exposure to extreme heat and hazards. *Id.* A second state agency medical consultant, Tom Brown, M.D. ("Dr. Brown"), reviewed the evidence and indicated the same restrictions in a physical RFC assessment on December 30, 2013. Tr. at 240.

Plaintiff followed up with Dr. O'Kelly on October 9, 2013. Tr. at 718. His glucose was 500 mg/dL. Tr. at 721. Dr. O'Kelly prescribed Cipro for prostatitis. *Id.*

Plaintiff presented to the ER at MRMC on October 13, 2013, with abdominal pain, nausea, and elevated blood glucose. Tr. at 833. He received intravenous insulin. Tr. at 835.

Plaintiff denied symptoms from chronic pancreatitis on October 15, 2013, but indicated his symptoms flared when he experienced hyperglycemia in preceding days. Tr. at 778. He stated his blood sugar continued to be over 300 mg/dL, despite his use of medication. *Id.* Dr. Culpepper ordered lab work and instructed Plaintiff on use of long-acting insulin. *Id.*

On October 15, 2013, Plaintiff complained of constant, sharp, and aching abdominal pain that was exacerbated by movement. Tr. at 857. Dr. Honaker observed Plaintiff's abdomen to be soft and mildly tender to palpation. Tr. at 858. He noted that Plaintiff was having increased symptoms and added a prescription for 300 milligrams of Neurontin, twice daily. Tr. at 859.

Plaintiff presented to the ER at MRMC on October 17, 2013, for abdominal pain and nausea. Tr. at 809. He was admitted and started on a low dose of Lantus. Tr. at 810. He was discharged with instructions to follow up with Dr. Culpepper in two weeks and to follow a low fat diet with no concentrated sweets. Tr. at 820.

Plaintiff presented to Dr. Culpepper with hyperglycemia on October 31, 2013. Tr. at 898. Dr. Culpepper noted that Plaintiff was taking 12 units of insulin from a Novolog Flexpen at each meal and was no longer taking Actos and Metformin. *Id.* Plaintiff reported that he was checking his blood sugar four to six times a day. *Id.* He stated his blood glucose level had ranged from 76 to 246 mg/dL, but had averaged 140 mg/dL or below over the prior week. *Id.* Dr. Culpepper referred Plaintiff for lab work and for assessment for an insulin pump. *Id.*

Plaintiff complained of constant, sharp, and aching abdominal pain on November 15, 2013. Tr. at 855. He denied side effects and indicated his pain medications were improving his ADLs and allowing him to do more. *Id.* Dr. Honaker observed Plaintiff's abdomen to be mildly tender to palpation. Tr. at 856. He refilled Dilaudid and Neurontin and recommended that Plaintiff be evaluated for an insulin pump. *Id.*

On December 5, 2013, Plaintiff reported his home glucose readings ranged from 75 to 179 mg/dL and averaged 120 mg/dL. Tr. at 904. He complained of a headache and sinus pressure, and Dr. Culpepper prescribed an antibiotic. *Id.*

Dr. Culpepper completed a mental status form on January 3, 2014. Tr. at 880. He indicated he had prescribed Lexapro to treat Plaintiff's symptoms of depression. *Id.* He noted that medication had helped Plaintiff's condition and that he had previously participated in psychiatric treatment. *Id.* He described Plaintiff as being oriented to time, person, place, and situation; having an intact thought process; demonstrating appropriate thought content; and having adequate attention, concentration, and memory. *Id.* He stated Plaintiff exhibited obvious work-related limitation in function. Tr. at 880. He indicated Plaintiff experienced stress secondary to pain and multiple disease processes. *Id.*

Plaintiff presented to endocrinologist Meenakshi Pande, M.D. ("Dr. Pande"), on February 3, 2014. Tr. at 1091. Dr. Pande noted that Plaintiff had been diagnosed with type I diabetes four months prior. *Id.* However, he indicated there was "also an element of Type 2 DM given [Plaintiff's] obesity, h/o of hypoglycemia prior to the pancreatitis episodes and his stron[g] f/h/o DM2." Tr. at 1093. He noted that Plaintiff frequently

skipped a mid-day meal because of chronic abdominal pain. *Id.* He added Metformin to help with insulin sensitization and increased Levemir to 20 units. Tr. at 1093–94.

On March 3, 2014, Plaintiff reported his blood glucose readings ranged from 66 to 177 mg/dL. Tr. at 909. He had gained 13 pounds. *Id.* Dr. Culpepper counseled Plaintiff on smoking cessation and refilled his medications. *Id.*

Plaintiff complained of abdominal pain on March 3, 2014. Tr. at 887. He rated his pain as a one to two on a 10-point scale with medication and a 10 without medication. Tr. at 889. He stated his pain interfered with his abilities to work and to engage in ADLs and was so severe that he could not eat or otherwise function without opiates. *Id.* Scott Mayhew, M.D. ("Dr. Mayhew"), stated Plaintiff "certainly has a legitimate medical need for his pain medications, based on records review." *Id.* However, he did not believe Methadone was the appropriate medication for Plaintiff. *Id.* He stated he would consider prescribing Exalgo 16 mg, after a urine drug screen and more thorough review of Plaintiff's records. *Id.* He subsequently noted that Plaintiff's records showed "no aberrant behaviors or signs of abuse or diversion." *Id.* He stated he would prefer that Plaintiff discontinue Benzodiazepines for anxiety and recommended that Plaintiff consult a psychiatrist to discuss alternative treatments for anxiety. Tr. at 890.

Plaintiff presented to Dr. Culpepper on March 11, 2014, with fever, body aches, joint pain, chills, shivering, and sweating. Tr. at 915. He feared he was having a reaction to Methadone. *Id.* Dr. Culpepper assessed gastroenteritis and referred Plaintiff for lab work. *Id.*

Plaintiff followed up with Dr. Culpepper on March 24, 2014. Tr. at 920. He indicated that his blood cultures had revealed Escherichia coli ("E. coli") during a recent hospitalization for sepsis.[1] *Id.* Dr. Culpepper indicated Plaintiff had received intravenous antibiotics through a peripherally inserted central catheter ("PICC") line in his right upper arm. *Id.* He noted that Plaintiff had lost 18 pounds. *Id.* Plaintiff indicated he had not used insulin in over two weeks because his blood sugar had been low or within normal limits. *Id.* He requested that Lexapro be refilled for anxiety, and Dr. Culpepper authorized the refill. *Id.*

On March 24, 2014, Plaintiff described his pain as a two on a 10-point scale with medication and a seven without medication. Tr. at 885. He stated his pain interfered with his ADLs and ability to work. *Id.* Dr. Mayhew noted that Plaintiff had recently been hospitalized for sepsis and was continuing to receive intravenous antibiotic medications. *Id.* He indicated Plaintiff had been weaned off Methadone and switched back to Dilaudid during his hospitalization. *Id.* He observed Plaintiff to have minimal abdominal tenderness. *Id.* Dr. Mayhew indicated he agreed with the discontinuation of Methadone because Dilaudid would allow Plaintiff "better quality of life and better function in that it reduces pain after eating allowing him to eat." Tr. at 886. He prescribed four milligrams of Dilaudid and instructed Plaintiff to take one to two tablets daily, as needed for pain. *Id.*

On April 7, 2014, Plaintiff informed Lindsay Powell, PA ("Ms. Powell") that he had lost 14 pounds and had been able to control his blood glucose with diet since his hospitalization. Tr. at 1084. He weighed 272 pounds. Tr. at 1086. Ms. Powell instructed

---

[1] Hospital notes from Plaintiff's treatment for sepsis were not included in the record.

Plaintiff to remain off insulin, but to monitor and record his blood glucose levels twice a day and to bring the log to his next visit. *Id.*

On April 23, 2014, Plaintiff reported that he had been exercising, walking, and doing yard work in an attempt to lose weight and had lost 14 pounds. Tr. at 958. He stated he felt as if he had pulled a muscle in his back. *Id.* Dr. Mayhew indicated Plaintiff's pancreas was producing some insulin, but his pain was unchanged. *Id.* He observed Plaintiff to have left paravertebral tenderness on musculoskeletal examination. Tr. at 959. He indicated Plaintiff's urine drug screen was consistent with the prescribed medications and refilled Dilaudid. *Id.*

On May 23, 2014, Plaintiff complained of more frequent flare ups of abdominal pain. Tr. at 955. Dr. Mayhew noted tenderness in Plaintiff's left upper abdominal quadrant. *Id.* Plaintiff indicated he would follow up with his endocrinologist for the increased flare ups. *Id.* Dr. Mayhew stated there had been no aberrant behaviors or signs of abuse or diversion. *Id.* He refilled Plaintiff's prescription for Dilaudid. *Id.*

On June 9, 2014, Plaintiff reported that his post-prandial glucose readings were typically around 200 if he was inactive, but would drop to the 60s if he engaged in any activity. Tr. at 1080. He indicated his typical fasting glucose was around 115. *Id.* He stated his blood glucose level would rise above 200 if he took Dilaudid and slept for a significant period. Tr. at 1082. Ms. Powell instructed Plaintiff to maintain a blood sugar log for 10 days and indicated Dr. Pande would adjust his medication based on the readings in the log. Tr. at 1083.

On July 1, 2014, Plaintiff reported two severe pain attacks during the prior week that had necessitated ER visits.[2] Tr. at 951. He indicated testing had shown elevated enzymes. *Id.* Dr. Mayhew observed Plaintiff to have mild tenderness in his left upper abdominal quadrant. *Id.* He refilled Plaintiff's prescription for Dilaudid and indicated he would review the ER records. Tr. at 951–52. He stated Plaintiff's last urine drug screen was consistent with his prescribed medications. Tr. at 952.

Plaintiff was treated for acute pancreatitis in the ER at MRMC on July 27, 2014. Tr. at 1048. He reported a one-week history of abdominal pain, nausea, and vomiting. Tr. at 1054. The attending physician indicated Plaintiff had normal lipase and no acute changes on CT scan. Tr. at 1067. Plaintiff reported feeling better after having received two doses of Dilaudid. *Id.*

On July 29, 2014, magnetic resonance imaging ("MRI") of Plaintiff's abdomen showed no acute pancreatic inflammation; atrophy of the pancreatic tail portions of the body from prior necrotizing pancreatitis; pancreatic stump tethered to the wall of the stomach by scar tissue; and polycystic kidney disease with some hemorrhagic or proteinaceous cysts. Tr. at 1045.

Plaintiff presented to the ER at MRMC on July 29, 2014, for abdominal pain and acute pancreatitis. Tr. at 1022. He reported that he had developed left upper quadrant pain while undergoing the MRI. Tr. at 1035. The attending physician noted moderate epigastric and left upper quadrant abdominal tenderness. Tr. at 1037.

---

[2] The record contains no ER records consistent with this period.

On August 1, 2014, Plaintiff reported to Dr. Mayhew that he had recently visited the ER on two occasions. Tr. at 947. He indicated an imaging report had shown "lots of scar tissue." *Id.* He rated his pain as a two to three with medication and a nine without medication. *Id.* Dr. Mayhew noted mild left upper quadrant tenderness with no guarding or rebound. *Id.* He reviewed Plaintiff's ER records and added a prescription for Lyrica as an adjuvant medication. Tr. at 948.

Plaintiff followed up with Dr. Pande on August 14, 2014. Tr. at 1076. Dr. Pande indicated Plaintiff's blood glucose log showed worsened glycemic control, despite the fact that Plaintiff was compliant with medications and home glucose monitoring and mostly compliant with diet. Tr. at 1078. He indicated Plaintiff was "getting more insulinopenic" because of repeated episodes of pancreatitis. Tr. at 1079. He instructed Plaintiff to resume 20 units of basal Levemir at bedtime and to increase the dosage by two units every three days until his blood glucose was 100 for three days in a row. *Id.*

Plaintiff followed up with Dr. Mayhew for pain management on August 29, 2014. Tr. at 941. He rated his pain as a two with medication and an eight without medication. Tr. at 943. He indicated Lyrica was providing some relief. *Id.* He stated the gastroenterologist had informed him that his pancreatic head had been damaged by recent attacks. *Id.* He indicated he was taking insulin again. *Id.* Dr. Mayhew observed epigastric tenderness to palpation. *Id.* He refilled Plaintiff's prescriptions for Dilaudid and Lyrica. Tr. at 944. He stated there were no aberrant behaviors or signs of abuse or diversion. *Id.*

On September 2, 2014, Dr. Culpepper noted that Plaintiff was not adhering to an exercise regimen for diabetes. Tr. at 931. Plaintiff reported that his home glucose

readings ranged from 113 to 435 mg/dL, but averaged 130 mg/dL. *Id.* He endorsed associated symptoms that included nausea, transient weakness, and tremor. *Id.* Dr. Culpepper counseled Plaintiff regarding tobacco cessation and weight gain. Tr. at 930. He refilled Plaintiff's other medications and added a prescription for Wellbutrin for worsening anxiety and depression. *Id.* He ordered lab work and instructed Plaintiff to use a cushion for coccygeal pain. *Id.*

Plaintiff presented to Dewey N. Ervin, M.D. ("Dr. Ervin"), on September 22, 2014, for tailbone pain. Tr. at 1377. He indicated he had initially noticed the pain around the same time that he was hospitalized for the E. coli infection. *Id.* He reported his pain was exacerbated by sitting, prolonged standing, and walking. *Id.* Dr. Ervin observed no skin changes or apparent swelling, but found Plaintiff to be tender at the tip of the coccyx at the ascrococcygeal joint. Tr. at 1378. X-rays were negative. *Id.* Dr. Ervin diagnosed subacute coccygodynia with no indication of infectious etiology. *Id.* He advised Plaintiff to sit on an inflated tube and to return if his symptoms failed to improve. *Id.*

Plaintiff presented to the ER at MRMC on September 28, 2014, with nausea, vomiting, and abdominal pain. Tr. at 1000. He reported recurrent flare ups of pancreatitis that were typically managed with medication. Tr. at 1010. He received intravenous fluids and medications and was discharged in stable condition. Tr. at 1014.

Plaintiff followed up with Dr. Mayhew for treatment of abdominal pain on October 1, 2014. Tr. at 937. He described sharp left upper abdominal pain that radiated to his back. Tr. at 939. He rated his pain as a four to five with medication and a nine without medication. *Id.* He indicated his pain interfered with his ADLs and ability to work. *Id.*

Plaintiff stated he had required one ER visit since his last appointment, but had not filled any prescriptions issued by ER physicians. *Id.* Dr. Mayhew indicated a record check confirmed Plaintiff's statement. *Id.* He observed Plaintiff to have diffuse mild-to-moderate abdominal tenderness, but no guarding or peritoneal signs. *Id.* He refilled Plaintiff's prescription for Dilaudid. Tr. at 940.

Plaintiff presented to the ER at MRMC on October 11, 2014, for abdominal pain, nausea, and vomiting. Tr. at 972. An abdominal ultrasound revealed liver and renal cysts, but was otherwise negative. Tr. at 986. Plaintiff received intravenous sodium chloride, Phenergan, and Dilaudid. Tr. at 985. He was discharged home with diagnoses of abdominal pain and chronic pancreatitis. Tr. at 987.

Plaintiff presented to the ER at MRMC on November 20, 2014, for abdominal pain and nausea. Tr. at 1123. His blood glucose level was 401 mg/dL. Tr. at 1124. He received intravenous medications. Tr. at 1113.

On December 2, 2014, Plaintiff reported that he had gained 15 pounds since his last visit. Tr. at 1435. He indicated some improvement with Wellbutrin. *Id.* Dr. Culpepper refilled the medication and instructed Plaintiff to titrate up his dosage to two tablets, twice daily. Tr. at 1435 and 1438.

Plaintiff reported no improvement in coccygodynia on December 22, 2014. Tr. at 1375. Dr. Ervin referred Plaintiff to McLeod Pain Management for possible injection. *Id.*

Plaintiff visited the ER at MRMC on January 2, 2015, for abdominal pain. Tr. at 1154. He reported an attack of pancreatitis that had been accompanied by intermittent

nausea and vomiting over the prior week. *Id.* He received intravenous pain medication and was discharged to his home. Tr. at 1148 and 1152.

On January 19, 2015, Plaintiff visited the ER at MRMC with abdominal pain, nausea, sweating, and hyperglycemia. Tr. at 1191. He indicated his pain had progressively worsened and was unresponsive to Zofran and Dilaudid. *Id.* The attending physician noted epigastric and mid-abdominal tenderness to palpation. Tr. at 1192. He diagnosed Plaintiff with abdominal pain and hyperglycemia. Tr. at 1177–84.

Plaintiff presented to the ER at MRMC on February 5, 2015, for abdominal pain and nausea. Tr. at 1232. He received intravenous pain medications. Tr. at 1226. He was diagnosed with abdominal pain and discharged to his home. Tr. at 1243.

Plaintiff returned to the ER at MRMC for abdominal pain on February 13, 2015. Tr. at 1267. He indicated his pain was accompanied by nausea and vomiting. *Id.* The attending nurse noted that Plaintiff had slightly elevated blood pressure, mild tachycardia, and mild epigastric tenderness. Tr. at 1268. The attending physician diagnosed chronic pancreatitis, abdominal pain, and opioid dependence. Tr. at 1259.

Plaintiff visited the ER at MRMC again on February 15, 2015. Tr. at 1310. He indicated he was having a severe pancreatic attack that had begun two days earlier and was accompanied by nausea and vomiting. *Id.* CT scans of Plaintiff's abdomen and pelvis showed no changes. Tr. at 1326–27. Plaintiff was treated with intravenous medications. Tr. at 1299. His discharge diagnoses included chronic pancreatitis, essential hypertension, and uncontrolled diabetes. Tr. at 1292.

Plaintiff presented to the ER at MRMC on March 2, 2015, for constant aching pain in his epigastric region that had begun one day prior. Tr. at 1337. He indicated the pain was accompanied by nausea and vomiting bile. *Id.*

Plaintiff visited the ER at CHS for abdominal pain on March 8, 2015. Tr. at 1416. A CT scan of Plaintiff's abdomen and pelvis showed no acute abnormality; splenomegaly, status post-partial pancreatectomy; and epigastric and umbilical fat-containing ventral hernias. Tr. at 1420.

On March 9, 2015, Plaintiff complained of pain in his left upper abdomen and tailbone. Tr. at 1373. Dr. Mayhew observed Plaintiff to have diffuse, mild epigastric tenderness and tenderness over the sacrococcygeal ligament. *Id.* He stated a sacrococcygeal ligament injection had provided no benefit and an MRI had been unremarkable. *Id.*

On March 18, 2015, Plaintiff reported moderate symptoms of anxiety and depression. Tr. at 1430. He indicated he desired to sleep all day, as opposed to engaging in ADLs. *Id.* He stated his anxiety significantly increased in social situations, causing him to sweat profusely. *Id.* He indicated Wellbutrin had been ineffective. *Id.* He informed Dr. Culpepper that he was testing his blood sugar three times a day and that it ranged from 76 to 297, but averaged around 140. *Id.* He endorsed symptoms that included fatigue, otalgia, nausea, vomiting, anxiety, depression, feeling down, and having little interest in activities. Tr. at 1432. Dr. Culpepper stopped Wellbutrin and increased Lexapro to 30 to 40 mg, as tolerated. Tr. at 1429. He refilled Plaintiff's other medications. *Id.*

Dr. Mayhew noted epigastric tenderness, but no other abnormalities on April 8, 2015. Tr. at 1369. He continued Plaintiff's medications. *Id.*

Plaintiff presented to CHS on April 11, 2015, for abdominal pain and vomiting. Tr. at 1402. The attending physician diagnosed pancreatitis and discharged Plaintiff with prescriptions for Promethazine and Zofran. Tr. at 1404.

On May 1, 2015, Plaintiff reported that he was recently "kicked out" of the ER at MRMC. Tr. at 1424. Dr. Culpepper noted Plaintiff weighed 312 pounds. Tr. at 1426. He observed Plaintiff to have hypoactive bowel sounds, a protuberant abdomen, and left upper abdominal tenderness. Tr. at 1427. He stated Plaintiff was fearful and agitated. *Id.* He prescribed Sinequan for depression and requested that a mental health visit be moved up because Plaintiff felt tearful and "out of control." Tr. at 1424.

On May 2, 2015, Plaintiff presented to CHS for abdominal pain that had gradually worsened over the prior week. Tr. at 1382. He endorsed nausea, vomiting, and constipation. Tr. at 1383. His blood pressure was elevated at 161/107 mm/Hg. *Id.* The attending physician observed Plaintiff to demonstrate moderate epigastric tenderness and moderate voluntary guarding. Tr. at 1384. He assessed abdominal pain, chronic pancreatitis, hyperglycemia, and vomiting and discharged Plaintiff with prescriptions for Phenergan and Zofran. Tr. at 1386

On May 8, 2015, Plaintiff indicated he had experienced "some really bad attacks" during the prior month. Tr. at 1364. He described his pain as sharp and indicated it was a three with medication and a 10 without medication. *Id.* Dr. Mayhew noted epigastric tenderness, but no guarding or rebound. Tr. at 1365. He indicated that opiates had

improved Plaintiff's pain and allowed him to function without side effects or medication abuse behaviors. *Id.*

b.      Evidence Submitted to Appeals Council

On June 9, 2015, Plaintiff presented to the ER at CHS with a flare up of chronic pancreatitis that had begun three days prior. Tr. at 1540. The attending physician noted moderate epigastric tenderness in Plaintiff's left upper abdominal quadrant. Tr. at 1542. He diagnosed chronic pancreatitis and abdominal pain and discharged Plaintiff with instructions to follow up with Dr. Culpepper. Tr. at 1544.

On June 10, 2015, Plaintiff reported that he had been unable to eat and had lost seven pounds. Tr. at 1562. Dr. Mayhew observed Plaintiff to have epigastric tenderness, but no guarding or rebound. Tr. at 1562. He advised Plaintiff to follow up with a gastroenterologist and to follow a low fat and clear liquid diet. Tr. at 1563.

On June 17, 2015, Plaintiff requested that his dosage of Seroquel to be increased, and Dr. Culpepper agreed to the change. Tr. at 1565.

Plaintiff presented to the ER at CHS on June 25, 2015. Tr. at 1509. He complained of a weeklong history of vomiting and abdominal pain that had been radiating to his back. *Id.* He reported gradual pain relief and requested that he be discharged. Tr. at 1513.

Plaintiff followed up with Dr. Wolford on July 10, 2015. Tr. at 1455. He complained of persistent abdominal pain and nausea. *Id.* Dr. Wolford assessed chronic pancreatitis, chronic nausea, and GERD. *Id.* He indicated he would review Plaintiff's records and would need to rule out gastroparesis with a gastric emptying scan. *Id.*

25

On July 15, 2015, Plaintiff reported that he had not been able to eat and had lost seven pounds. Tr. at 1558. He indicated his pain interfered with his ability to engage in ADLs, but that his abilities to shower, dress, clean, and eat had improved with medication. *Id.* Dr. Mayhew indicated Seroquel had been helpful. *Id.* He observed Plaintiff to have epigastric and left upper quadrant tenderness. *Id.* He indicated Plaintiff's medication regimen had allowed him to eat and function better and had reduced his pain. Tr. at 1559.

Plaintiff visited the ER at CHS on August 5, 2015, for a three-day history of abdominal pain. Tr. at 1490. He did not desire to be admitted and was discharged with a diagnosis of abdominal pain. Tr. at 1492.

On August 9, 2015, Plaintiff presented to the ER at CHS for epigastric pain that radiated to his right upper quadrant with nausea and vomiting. Tr. at 1476. A CT scan was unremarkable. Tr.at 1479. Plaintiff was discharged to his home. *Id.*

Plaintiff visited the ER at CHS for abdominal pain, nausea, and vomiting on August 18, 2015. Tr. at 1461. Plaintiff's pain and nausea gradually improved. Tr. at 1464. He was able to tolerate clear liquids and asked to be discharged. *Id.*

Plaintiff complained of epigastric pain on September 29, 2015. Tr. at 141. Dr. Wolford stated he was unsure whether Plaintiff still had low-grade pancreatitis because recent CT scans had not indicated inflammation. *Id.* He referred Plaintiff for an endoscopic ultrasound. *Id.*

On November 4, 2015, Plaintiff presented to Nailah Roland, M.D. ("Dr. Roland"), to establish primary care. Tr. at 20. He complained of anxiety, elevated blood pressure,

panic attacks, pain that radiated from his right side to his abdomen, and foul-smelling urine. *Id.* He reported that he had gained 20 pounds over the prior two-month period. Tr. at 22. Dr. Roland recorded Plaintiff's weight as 322 pounds and his BMI as 46.2. *Id.* Plaintiff's blood pressure was 142/100 mm/Hg. *Id.* Dr. Roland noted the presence of a ventral hernia. Tr. at 23. She referred Plaintiff for routine lab work and indicated she would obtain records from his previous physicians. *Id.* She prescribed medication for depression, anxiety, hypertension, and restless leg syndrome and referred Plaintiff to a general surgeon for ventral hernia repair. Tr. at 23–24.

Plaintiff reported a rapid pulse on December 4, 2015. Tr. at 11. Dr. Roland indicated Plaintiff's chronic conditions were stable and that he should return following hernia surgery. Tr. at 15.

On December 30, 2015, Plaintiff indicated he had missed a post-operative visit for staple removal because he was feeling nauseated. Tr. at 10. He reported decreased urine output, swelling in his feet, weight gain, mild dyspnea on exertion, and a small area of erythema to the last staple at the beginning of the surgical incision. *Id.* Dr. Roland noted the small area of erythema, but observed no other abnormalities on physical examination. Tr. at 10–11. Plaintiff reported he no longer needed Lorazepam, and Dr. Roland discontinued the medication. Tr. at 11. Dr. Roland prescribed Clonazepam, referred Plaintiff for blood work, and instructed him to record his blood pressure readings. *Id.* She completed a medical opinion form, which is set forth in detail and discussed below. Tr. at 136–39.

On March 16, 2016, Plaintiff complained that his pain management physician was not adequately addressing his chronic abdominal pain. Tr. at 103. He reported increased anxiety, elevated resting heart rate, and hypertension. *Id.* He indicated he did not believe Seroquel was providing any relief. *Id.* Dr. Roland instructed Plaintiff to maintain a blood pressure log and to follow up in two weeks. Tr. at 105. She prescribed medications for generalized anxiety disorder, palpitations, restless leg syndrome, hypercholesterolemia, and major depressive disorder. *Id.*

On April 26, 2016, Dr. Roland indicated Plaintiff's pain management physician was discharging him because he had visited the ER too frequently for pain exacerbations. Tr. at 92. Plaintiff requested a 90-day refill on his medications. *Id.* Dr. Roland noted Plaintiff's hemoglobin A1c of nine percent was consistent with uncontrolled diabetes mellitus. Tr. at 94. She prescribed Bupropion for depression and Clonazepam for generalized anxiety disorder. Tr. at 93–94. She referred Plaintiff to another pain management physician for chronic abdominal pain and to a nephrologist for polycystic kidney disease. Tr. at 94.

On May 7, 2016, an echocardiogram showed mild concentric left ventricular hypertrophy; estimated left ventricular ejection fraction of 55–60%; normal left ventricular size; mild tricuspid regurgitation; and no aortic regurgitation. Tr. at 130.

On May 24, 2016, Dr. Roland indicated Plaintiff was doing well on home oxygen, but had been observed to desaturate to the low 80s with ambulation. Tr. at 83. Plaintiff reported increased energy and decreased snoring with use of oxygen. *Id.* He complained of bilateral lower extremity edema and redness. *Id.* Dr. Roland noted that Plaintiff had

been unwilling to follow up with the pain management practice in Pawley's Island because he considered it to be like a drug rehabilitation facility. Tr. at 84. She refilled prescriptions for Dilaudid for chronic abdominal pain, Xaralto for pulmonary embolism, and Clonazepam and Lyrica for generalized anxiety disorder. *Id.*

On June 27, 2016, Plaintiff reported suprapubic discomfort, low-grade fever, and slight discomfort on the left side of his chest. Tr. at 70. Dr. Roland observed Plaintiff to be morbidly obese; to be using an oxygen tank; to have suprapubic tenderness and a midline abdominal scar; and to have an erythematous rash. Tr. at 70–71. She indicated Plaintiff's chronic conditions were stable. Tr. at 71.

On July 26, 2016, Plaintiff reported that he had made several recent trips to the ER and had been out of his medication for several days. Tr. at 60. He complained of shortness of breath and indicated he was wearing oxygen. *Id.* Dr. Roland referred Plaintiff to a pain management physician for chronic abdominal pain and to a pulmonologist for pulmonary embolism. Tr. at 61. She instructed Plaintiff to maintain a blood sugar log and to bring it to his next visit. *Id.*

Plaintiff presented to pulmonologist Rami Zebian, M.D. ("Dr. Zebian"), for an initial visit on August 17, 2016. Tr. at 119–20. Dr. Zebian noted that Plaintiff had been diagnosed with deep venous thrombosis and pulmonary embolism and had been on home oxygen since May. Tr. at 122. Plaintiff reported lower extremity swelling, dyspnea on exertion, weight gain, exercise intolerance, and fatigue. *Id.* Dr. Zebian noted no abnormalities on physical examination. Tr. at 122. He ordered a six-minute walk test and an echocardiogram and instructed Plaintiff to follow up with Dr. Maqsoud for diuretics.

Tr. at 123. The echocardiogram showed low normal systolic function; a left ventricular ejection fraction of 50 to 55%; normal left and right ventricular size; borderline enlarged atrium; and no aortic regurgitation. Tr. at 128.

On August 29, 2016, Plaintiff presented to Roberto Miranda, M.D. ("Dr. Miranda"), for medication refills. Tr. at 50. Dr. Miranda indicated that Plaintiff's last urine drug screen was negative for Dilaudid. Tr. at 51. He declined to refill the prescription for Dilaudid and informed Plaintiff that he would be discharged from the clinic. *Id.*

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     Plaintiff's Testimony

At the hearing on May 20, 2015, Plaintiff testified he was forced to resign from his job as a shift supervisor with CVS because he had missed too many days of work. Tr. at 179. He indicated he would be unable to return to his past work because it required "a lot of lifting, standing and walking"; he did not often get breaks; and he could not handle the stress. Tr. at 181.

Plaintiff testified that he had developed necrotizing pancreatitis with a pseudocyst. Tr. at 181. He stated he had undergone surgery and had received blood transfusions. Tr. at 181–82. He reported he had developed complications that had required additional surgery. Tr. at 182. He stated Dr. Martinie had advised him to apply for disability benefits because he had continued to be sick and to require use of pain medication after he returned to work. *Id.*

Plaintiff stated he was 5'10" tall and weighed 300 pounds. Tr. at 181. He testified that pancreatitis was the most severe impairment that prevented him from being able to work. *Id.* He indicated it caused him to experience severe pain, nausea, and vomiting and to have difficulty lifting and sitting for long periods. Tr. at 183. He described his pain as radiating from his ribcage to his back. *Id.* He indicated he experienced pain most of the time, but that it increased in severity three or four times per week. Tr. at 183–84.

Plaintiff testified that his diabetes was poorly controlled. Tr. at 185. He indicated he had difficulty maintaining an adequate blood sugar level because of pancreatitis. *Id.* He stated he was prescribed Levemir, Novolog, and Farxiga for diabetes. Tr. at 185–86.

Plaintiff indicated he had been diagnosed with polycystic kidney disease, but denied symptoms. Tr. at 189. He endorsed a history of depression and anxiety and indicated he had been diagnosed with obsessive compulsive disorder ("OCD"). Tr. at 189–90. He stated his doctors had indicated he might have post-traumatic stress disorder ("PTSD"), as well. Tr. at 190. He indicated he was taking Klonopin, Seroquel, and Lexapro. *Id.* He stated Dr. Culpepper had referred him to a mental health clinic, but an appointment had not yet been scheduled. *Id.*

Plaintiff stated he walked with an impaired gait because one of his feet "turn[ed] in" and his foot sometimes gave way. Tr. at 191. He testified that his medication caused him to feel dizzy. *Id.* He reported that walking exacerbated symptoms of pancreatitis. *Id.* He stated his pain increased if he lifted anything heavier than a gallon of milk. Tr. at 192. He claimed that he had difficulty bending over. *Id.* He indicated his medications caused

his hands to be "a little bit shaky," but that he could use them. *Id.* He reported that he would lie down for the majority of the day on two days per week. *Id.*

Plaintiff indicated he was prescribed Dilaudid twice a day for pain, but only took the medication three or four times per week. Tr. at 186 and 189. He indicated he sometimes doubled his dose when his pain was more severe. Tr. at 186. He reported he would visit the ER if his pain did not decrease after he took the additional dose of Dilaudid. Tr. at 187. He estimated he visited the ER twice a month when he could not control his pain with medication because of nausea and vomiting. *Id.* He stated the medication impaired his concentration and affected his ability to drive. Tr. at 186. He indicated he had once been "an avid video gamer," but could no longer concentrate to play video games. Tr. at 193. He stated he had difficulty focusing on a television show for more than 30 minutes. *Id.*

Plaintiff testified that he lived with his mother. Tr. at 179. He indicated he was able to vacuum, cook, and care for his dog. *Id.* He stated he used an iPad and watched television during the day. Tr. at 179–80. He indicated he was able to drive, but often rode with his mother because he was not supposed to drive while using narcotic pain medications. Tr. at 180. He reported he attended doctors' visits and shopped for groceries. *Id.* He stated he had not recently attended church because he had difficulty sitting for long periods. *Id.*

b.  Vocational Expert Testimony

Vocational Expert ("VE") Coretta Harrelson reviewed the record and testified at the hearing. Tr. at 195–97. The VE categorized Plaintiff's PRW as a bookkeeper,

*Dictionary of Occupational Titles* ("*DOT*") number 210.382-014, as sedentary with a specific vocational preparation ("SVP") of six, and an assistant director of pharmacy services, *DOT* number 074.167-010, as light with an SVP of eight. Tr. at 195. The ALJ described a hypothetical individual of Plaintiff's vocational profile who was limited to sedentary work with only occasional postural activities; simple, routine, and repetitive tasks; and should work in a low-stress environment that required no fast-paced production or rigid quotas. Tr. at 195–96. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 196. The ALJ asked whether there were any other jobs that the hypothetical person could perform. *Id.* The VE identified sedentary jobs with an SVP of two as a lens inserter, *DOT* number 713.687-026, with 318,000 positions in the national economy; an eyeglass frame polisher, *DOT* number 713.684-038, with 242,000 positions in the national economy; and a weight tester, *DOT* number 539.485-010, with 467,000 positions in the national economy. *Id.*

The ALJ asked the VE to further consider that the individual would need to change positions every 45 minutes to an hour. *Id.* He asked if the additional restriction would affect the jobs identified in response to the prior question. *Id.* The VE indicated the individual could still perform those jobs as long as he did not leave the work station and continued to perform the job tasks in both the seated and standing positions. *Id.*

The ALJ asked the VE to consider that the individual would require a break for ten minutes each hour. Tr. at 197. He asked if the additional limitation would affect the jobs identified in response to the prior question. *Id.* The VE stated the additional restriction

would be considered excessive absence from work activity and would not be tolerated. *Id.*

The ALJ asked the VE to consider that the individual would miss two or more days of work per month. *Id.* He asked if the absences would affect the individual's ability to perform the jobs identified in response to the prior question. *Id.* The VE responded that the number of absences would be considered excessive and that the individual would be unable to maintain full time employment. *Id.*

Plaintiff's attorney asked the VE to consider that, as a result of chronic pain or effects from use of narcotic pain medication, the individual would be unable to concentrate or focus on tasks and would occasionally abandon tasks during the workday. *Id.* She asked if the additional restriction would affect the individual's ability to perform the jobs identified in response to the prior questions. *Id.* The VE stated there would be no jobs in the national economy that would accommodate the limitation. *Id.*

2.   The ALJ's Findings

In his decision dated June 15, 2015, the ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.
2.   The claimant has not engaged in substantial gainful activity since March 30, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.   The claimant has the following severe impairments: chronic pancreatitis status post gastrostomy (with associated diabetes mellitus), anxiety, and depression (20 CFR 404.1520(c) and 416.920(c)).
4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments

in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he is limited to occasional performance of postural activities. The claimant is further limited to the performance of simple, routine, repetitive tasks in a low stress environment with no fast paced production or quotas.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on June 1, 1978 and was 34 years old, which is defined as a younger individual age 18–49, on the date the application was filed (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 30, 2013, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 154–67.

II. Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the Appeals Council erred in failing to remand the case based on new and material evidence that pertained to Plaintiff's condition during the relevant period;

2) the ALJ erred in weighing medical opinions from Plaintiff's treating physicians;

3) the ALJ's RFC assessment was not supported by substantial evidence because he did not include restrictions that pertained to Plaintiff's chronic

absenteeism and impaired abilities to focus, concentrate, and attend to tasks because of chronic pain and required use of narcotic pain medications; and

4)   the ALJ erred in finding Plaintiff's allegations to be less than fully credible.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.   Legal Framework

1.   The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such

_____

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to

36

impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520 and § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) and § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b) and § 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward

---

assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525 and § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii) and § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526 and § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h) and § 416.920(h).

with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S.

at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

The record indicates Plaintiff's most severe problem to be chronic pancreatitis. The U.S. National Library of Medicine, a service of the National Institutes of Health,[5] explains that "[p]ancreatitis is swelling of the pancreas" and "[c]hronic pancreatitis is present when this problem does not heal or improve, gets worse over time, and leads to permanent damage." *Chronic Pancreatitis*, Medline Plus (Oct. 27, 2015). Available from https://medlineplus.gov/ency/article/000221.htm. According to the available research, "[d]amage to the parts of the pancreas that make insulin may lead to diabetes." *Id.* Thus, Plaintiff's development of diabetes was an anticipated complication of chronic pancreatitis.

Symptoms of chronic pancreatitis include abdominal pain that may be greatest in the upper abdomen; last from hours to days; always be present, over time; worsen from eating, drinking, or consuming alcohol; and be felt in the back. *Id.* Digestive problems

---

[5] A court may take judicial notice of factual information in postings on government website. *See Phillips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) ("court may take judicial notice of matters of public record").

associated with chronic pancreatitis include chronic weight loss, diarrhea, nausea, vomiting, and abnormal stools. *Id.*

Treatment options include hospitalization for pain medication, intravenous fluids, oral diet, and tube-feeding; prescriptions for pancreatic enzymes, insulin, and pain medications; surgical intervention; dietary changes; and avoidance of smoking and drinking alcoholic beverages. *Id.* Chronic pancreatitis "is a serious disease that may lead to disability and death." *Id.*

In light of this background information, the undersigned considers Plaintiff's specific allegations of error.

### 1.     Evidence Submitted to Appeals Council

Plaintiff argues the Appeals Council erred in declining to remand his case to the ALJ to consider new evidence that pertained to the relevant period. [ECF No. 13 at 33]. He contends that the ALJ should have been given the opportunity to review the medical source statement from Dr. Roland. *Id.* He maintains that the fact that Dr. Roland's opinion was rendered after the ALJ's decision is of no consequence because she addressed impairments that were present prior to the hearing. *Id.* at 34.

The Commissioner argues the Appeals Council properly concluded that Dr. Roland's statement did not provide a basis for changing the ALJ's decision because it pertained to a later period. [ECF No. 14 at 10]. She points out that Plaintiff first visited Dr. Roland five months after the ALJ's decision and maintains that Dr. Roland's opinion was neither chronologically relevant nor material. *Id.* She contends that the evidence during the relevant period did not indicate Plaintiff had any functional limitations as a

result of hernias. *Id.* at 11. She further claims that Dr. Roland had only examined Plaintiff on three occasions prior to rendering her opinion and lacked a longitudinal treatment history that would entitle her opinion to greater weight under the regulations. *Id.* at 12.

A claimant may submit additional evidence that was not before the ALJ at the time of the hearing, along with a request for review of the ALJ's decision. *Meyer v. Astrue,* 662 F.3d 700, 705 (4th Cir. 2011), citing 20 C.F.R. § 404.967. However, the evidence must be both "new" and "material" and the Appeals Council may only consider the additional evidence "where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b) and § 416.1470(b) (effective Feb. 9, 1987 to Jan. 16, 2017). "Evidence is new 'if it is not duplicative or cumulative' and is material if there is 'a reasonable possibility that the new evidence would have changed the outcome.'" *Meyer*, 662 F.3d at 705, *citing Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

If new and material evidence is offered and it pertains to the period on or before the date of the ALJ's hearing decision, the Appeals Council should evaluate it as part of the entire record. 20 C.F.R. § 404.970(b) and § 416.1470(b) (effective Feb. 9, 1987 to Jan. 16, 2017). After reviewing the new and material evidence and all other evidence of record, the Appeals Council will either issue its own decision or remand the claim to the ALJ if it concludes that the ALJ's "action, findings, or conclusion" was "contrary to the weight of the evidence." *Meyer*, 662 F.3d at 705, citing 20 C.F.R. § 404.970(b). However, if after considering all the evidence, the Appeals Council decides that the ALJ's actions, findings, and conclusions were supported by the weight of the evidence,

the Appeals Council will deny review and is not obligated to explain its rationale. *Id.* at 705–06.

"In reviewing the Appeals Council's evaluation of new and material evidence, the touchstone of the Fourth Circuit's analysis has been whether the record, combined with the new evidence, 'provides an adequate explanation of [the Commissioner's] decision.'" *Turner v. Colvin*, No. 0:14-228-DCN, 2015 WL 751522, at *5 (D.S.C. Feb. 23, 2015), citing *Meyer*, 662 F.3d at 707 (quoting *DeLoatche v. Heckler*, 715 F.3d 148, 150 (4th Cir. 1983)). After reviewing new evidence submitted to the Appeals Council, the court should affirm the agency's decision where "substantial evidence support[ed] the ALJ's findings." *Id.*, citing *Smith v. Chater*, 99 F.3d 635, 638–39 (4th Cir. 1996). However, if a review of the record as a whole shows the new evidence supported the plaintiff's claim and was not refuted by other evidence, the court should reverse the ALJ's decision and find it to be unsupported by substantial evidence. *Id.*, citing *Wilkins v. Secretary, Department of Health and Human Services*, 953 F.3d 93, 96 (4th Cir. 1991). If the addition of the new evidence to the record does not allow the court to determine whether substantial evidence supported the ALJ's denial of benefits, the court should remand the case for further fact finding. *Id.*

Because Plaintiff has limited his argument regarding the Appeals Council's treatment of the new evidence to a discussion of Dr. Roland's opinion, the undersigned has limited analysis to that particular evidence.

On December 30, 2015, Dr. Roland indicated Plaintiff was restricted as follows: occasionally lifting and/or carrying 10 pounds; frequently lifting and/or carrying 10

pounds; standing and/or walking less than two hours in an eight-hour workday; must periodically rotate sitting and standing to relieve pain or discomfort; never crawling or climbing ladders, ropes, or scaffolds; occasionally balancing, stooping, kneeling, crouching, and stooping; occasionally reaching; frequently fingering; and limited exposure to temperature extremes, noise, vibrations, humidity, hazards, and fumes. Tr. at 137–39. She stated Plaintiff's chronic pancreatitis and multiple abdominal hernias caused chronic abdominal discomfort and pain with repetitive movements. Tr. at 137. She indicated Plaintiff's abilities to engage in reaching and fingering were affected by a tremor at rest, deliberate movements, and pain elicited by overhead reaching. Tr. at 138.

The Appeals Council reviewed Dr. Roland's opinion, in addition to other records, but found that it was "about a later time" and did not "affect the decision about whether [Plaintiff] was disabled beginning on or before June 15, 2015." Tr. at 2.

In *Nix v. Colvin*, 2015 WL 799528, at *10 (D.S.C. Feb. 25, 2015), the court explained that the Fourth Circuit had noted in *Bird v. Commissioner of Social Sec. Admin.*, 699 F.3d 337, 345 (4th Cir. 2012), that "an ALJ must give retrospective consideration to medical evidence created after a claimant's last insured date when such evidence may be 'reflective of a possible earlier and progressive degeneration.'" The court further stated that its decisions in *Wise v. Colvin*, No. 6:13-2712-RMG, 2014 WL 7369514, at *6–7 (D.S.C. Dec. 29, 2014) and *Dickerson v. Colvin*, No. 5:12-33-DCN, 2013 WL 4434381, at *14 (D.S.C. Aug. 14, 2013), had "suggested the holding" in *Bird* "extend[ed] to situations in which evidence arises after the date of ALJ's decision, but before the Appeals Council makes a decision to grant or deny review." *Nix*, 2015 WL

799528, at *10. In *Bird*, 699 F.3d at 340–41, the court specified that its prior decisions had recognized that "retrospective consideration of evidence" was "appropriate when the record is not so persuasive as to rule out any linkage of the final condition of the claimant with his earlier symptoms." Thus, "medical records from a later time period may be probative and relevant to establishing disability in an earlier time period if there is 'linkage' between the later treatment and the impairments at issue in the claimant's disability claim." *Bruton v. Berryhill*, No. 8:16-1006-RMG, 2017 WL 1449542, at *6 (D.S.C. Apr. 24, 2017), citing *Bird*, 699 F.3d at 340–41.

A comparison of the Dr. Roland's opinion to the evidence prior to the ALJ's decision demonstrates linkage. Dr. Roland specified that her opinion was based on Plaintiff's "MULTIPLE COMORBIDITIES INCLUDING CHRONIC PANCREATITIS AND MULTIPLE ABDOMINAL HERNIAS WHICH CAUSE CHRONIC ABDOMINAL DISCOMFORT AND PAIN WITH REPETITIVE MOVEMENTS." Tr. at 137. The record contains voluminous evidence that pertains to Plaintiff's chronic pancreatitis and abdominal discomfort. *See, e.g.*, Tr. at 713. It also references the existence of abdominal hernias. Tr. at 681–82, 768, and 1420. Although the Commissioner argues that Plaintiff's abdominal hernias did not cause functional limitations during the relevant period, evidence of their presence prior to the ALJ's decision may be "reflective" of the "possible earlier and progressive degeneration" indicated in *Bird*, 699 F.3d at 345. Therefore, Dr. Roland's indication that Plaintiff's functional limitations resulted from impairments that were present prior to the ALJ's decision was sufficient to demonstrate potential linkage between the two.

Dr. Roland's opinion was also new and material. It meets the newness criterion in that it is not duplicative of other evidence already in the record. *See Meyer*, 662 F.3d at 705. The ALJ indicated he gave little weight to Dr. Martinie's statement that he would support Plaintiff in applying for disability because he "failed to describe specific work related abilities or limitations" and his opinion "offer[ed] little insight into the claimant's residual functional capacity." Tr. at 160. He similarly gave little weight to Dr. Culpepper's note that Plaintiff was disabled by chronic pain because he "failed to set forth any specific physical work related abilities or limitations." Tr. at 161. Because Dr. Roland provided the information that the ALJ found to be lacking in Dr. Martinie's and Dr. Culpepper's opinions, her opinion could have reasonably changed the outcome of the case and would, therefore, be material.

Although Dr. Roland's opinion is new, material, and relates to the period prior to the ALJ's decision, it does not naturally direct a finding that Plaintiff was disabled prior to the date of the ALJ's decision. The exertional and postural restrictions Dr. Roland identified were similar to those the ALJ included in the RFC assessment. *Compare* Tr. at 137–39 (indicating Plaintiff could lift and/or carry 10 pounds occasionally and frequently; could stand and/or walk for less than two hours in an eight-hour workday; must periodically rotate sitting and standing; and could occasionally balance, kneel, crouch, and stoop), *with* Tr. at 158 (providing that Plaintiff had the RFC to perform sedentary work, but was limited to occasional performance of postural activities). Dr. Roland further specified Plaintiff could never climb or crawl; could occasionally reach in all directions; could frequently finger; and required limited exposure to temperature

extremes, noise, vibration, humidity, hazards, fumes, odors, chemicals, and gases. *See* Tr. at 137–39. Without input from a VE, it is unclear whether these additional restrictions would preclude Plaintiff from engaging in substantial gainful activity. In light of the need for additional fact finding, the undersigned recommends the court remand the case to the Commissioner for specific consideration of Dr. Roland's medical source statement.

### 2.    Dr. Martinie's Opinion

On March 26, 2013, Dr. Martinie had "a long frank discussion" with Plaintiff "about the lifelong debilitating pain that often" accompanied his type of pancreatitis. Tr. at 585. In response to their conversation, Dr. Martinie expected that Plaintiff might be applying for disability and indicated he would "enthusiastically support" that decision. *Id.*

Plaintiff argues the ALJ erred in declining to accord controlling weight to Dr. Martinie's opinion that his lifelong debilitating pain was disabling. [ECF No. 13 at 34–38]. He maintains that Dr. Martinie's opinion is supported by observations and opinions from Drs. Mayhew and Culpepper. *Id.* at 36–38.

The Commissioner argues that substantial evidence supports the ALJ's evaluation of Dr. Martinie's opinion. [ECF No 14 at 13–14]. She maintains that Dr. Martinie's opinion was entitled to no particular weight because it was an opinion on an issue reserved to the Commissioner and did not provide information about Plaintiff's work-related abilities or limitations. *Id.* at 14. She further contends Dr. Martinie's comments "were a general discussion of what often happens in cases of pancreatitis like Plaintiff's and they did not describe Plaintiff's specific work-related abilities or limitations." *Id.* at 15. She claims the record showed that Plaintiff's pain medications relieved his pain and

allowed him to engage in ADLs. *Id.* at 15. She maintains the ALJ specifically considered Dr. Culpepper's opinion in limiting Plaintiff to "simple, routine, repetitive tasks in a low stress environment with no-fast paced production or quotas." *Id.* at 15.

ALJs must consider all medical opinions of record. 20 C.F.R. § 404.1527(b) and § 416.927(b) (effective Aug. 24, 2012 to Mar. 26, 2017). However, "[o]pinions on some issues . . . are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. § 404.1527(d) and § 416.927(d) (effective Aug. 24, 2012 to Mar. 26, 2017). "Opinions that you are disabled" are among those reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(1) and § 416.927(d)(1) (effective Aug. 24, 2012 to Mar. 26, 2017). The law does not give "any special significance to the source of an opinion on issues reserved to the Commissioner." 20 C.F.R. § 404.1527(d)(3) and § 416.927(d)(3) (effective Aug. 24, 2012 to Mar. 26, 2017).

Nevertheless, "[t]he adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination of disability, including opinions from medical sources about issues reserved to the Commissioner." SSR 96-5p. "If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record. *Id.* In evaluating the medical source's opinion, the ALJ should consider (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the

claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. § 404.1527(c) and § 416.927(c) (effective Aug. 24, 2012 to Mar. 26, 2017).

It is not the role of this court to disturb the ALJ's determination as to the weight to be assigned to a medical source opinion "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624, 1998 WL 702296, at *2 (4th Cir. 1998) (unpublished table decision) (per curiam).

As an initial matter, the undersigned rejects the Commissioner's argument that Dr. Martinie was providing "a general discussion of what often happens in cases of pancreatitis," as opposed to describing Plaintiff's specific work-related limitations. "[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ." *Cassidy v. Colvin*, No. 1:13-821-JFA-SVH, 2014 WL 1094379, at *7 n.4 (D.S.C. Mar. 18, 2014), citing *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003). The ALJ's discussion of Dr. Martinie's opinion suggests that he considered it to be an opinion as to Plaintiff's work-related limitations. He noted that because Dr. Martinie had provided an opinion on an issue reserved to the Commissioner, his opinion was not

entitled to any particular significance and concluded that Dr. Martinie's opinion was entitled to little weight because he did not describe specific work-related limitations that were pertinent to Plaintiff's RFC. Tr. at 160. The ALJ's second reason for according little weight to Dr. Martinie's opinion is tantamount to a restatement of his first. Because Dr. Martinie submitted that Plaintiff was disabled as a result of lifelong, debilitating pain, he did not provide more specific work-related limitations or assess Plaintiff's RFC.

Although he was not required to accord any particular weight to Dr. Martinie's opinion, the ALJ was required to evaluate it in light of the relevant factors in 20 C.F.R. § 404.1527(c) and § 416.927(c) (effective Aug. 24, 2012 to Mar. 26, 2017). SSR 96-5p. A review of the ALJ's decision reveals some discussion of the examining and treating relationship between Plaintiff and Dr. Martinie, the supportability of Dr. Martinie's opinion in his own records, and Dr. Martinie's specialization as an abdominal surgeon. *See* Tr. at 160; *see also* 20 C.F.R. § 404.1527(c)(1), (2), (3), (5) and § 416.927(c)(1), (2), (3), (5) (effective Aug. 24, 2012 to Mar. 26, 2017). It is not clear from his decision if the ALJ considered whether Dr. Martinie's opinion was consistent with the other evidence of record. However, as Plaintiff points out, the record contains evidence from Drs. Culpepper and Mayhew that arguably supports a finding that his pain is disabling. *See* Tr. at 768, 880, and 889.

Despite his recognition of some of the relevant factors in 20 C.F.R. § 404.1527(c) and 416.927(c), it is not evident that the ALJ weighed Dr. Martinie's opinion based on these factors. His discussion of the examining, treating, supportability, and specialization factors seems to weigh in favor of the opinion. *See* Tr. at 160; *see also* 20 C.F.R. §

404.1527(c) and § 416.927(c) (effective Aug. 24, 2012 to Mar. 26, 2017). He offered no explanation as to how the supportability factor weighed against Dr. Martinie's opinion. *See id.*; *see also* 20 C.F.R. § 404.1527(c)(4) and 416.927(c)(4) (effective Aug. 24, 2012 to March 26, 2017). Therefore, the undersigned recommends the court find the ALJ's decision to accord little weight to Dr. Martinie's opinion is not supported by substantial evidence because it is not based on a review of the entire case record, as required by SSR 96-5p , or a weighing of the relevant factors in 20 C.F.R. § 404.1527(c) and § 416.927(c).

### 3. RFC Assessment

Plaintiff argues the ALJ failed to consider several relevant factors in assessing his RFC. [ECF No. 13 at 38–42]. He maintains the ALJ declined to consider that his impairment would necessitate frequent absences from work. *Id.* at 38. He contends the frequency of doctors' appointments and ER visits in the record demonstrate that he would miss work more than twice a month, which the VE testified would not allow an individual to maintain employment. *Id.* at 39–40. He further asserts that the ALJ erred in failing to incorporate into the RFC assessment any functional limitations that pertained to the effects of pain and medications on his abilities to focus, concentrate, and attend to tasks. *Id.* at 40.

The Commissioner argues the ALJ properly excluded limitations related to chronic absenteeism because such limitations were not supported by the record. [ECF No. 14 at 17]. She maintains that Plaintiff has identified no evidence, other than his testimony, that would establish that he would be chronically absent from work and would have impaired abilities to focus, concentrate, and attend to tasks. *Id.* at 17–18. She further contends that

the objective evidence shows no problems with chronic absenteeism or abilities to focus, concentrate, and attend to tasks. *Id.* at 18–19.

A claimant's RFC represents the most he can still do despite his limitations. 20 C.F.R. § 416.945(a). It must be based on all the relevant evidence in the case record and should account for all of the claimant's medically-determinable impairments. *Id.*

Evidence relevant to the RFC assessment includes "[t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption of routine, side effects of medication)" and "[e]ffects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." SSR 96-8p. "[I]f an individual's medical treatment significantly interrupts the ability to perform a normal, eight-hour workday, then the ALJ must determine whether the effect of treatment precludes the claimant from engaging in gainful activity." *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000) (providing that the ALJ should consider the effect of ongoing treatment where the record indicated that the plaintiff visited the doctor, hospital, and emergency room frequently during the period in question and occasionally slept for several hours during the day because of illness and treatment); *see also Meyer v. Astrue*, 662 F.3d 700, 707 n.3 (4th Cir. 2011) (instructing Commissioner to consider the effect of more than 170 physical therapy sessions on the plaintiff's ability to remain gainfully employed during the period of claimed disability).

The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities,

observations)." SSR 96-8p, 1996 WL 374184 at *7 (1996). The ALJ must determine the claimant's ability to perform work-related physical and mental abilities on a regular and continuing basis. *Id.* at *2. He must explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* at *7. "[R]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

a.     Frequent Medical Treatment

Plaintiff's testimony and the medical evidence suggest he would miss work frequently. Plaintiff testified during the hearing that he was forced to resign from his job at CVS because he had missed too many days of work. Tr. at 179. He indicated he had required twice monthly ER visits over the prior six-month period. Tr. at 187. He stated that on two days per week, he was unable to perform household chores and spent the majority of the day on the couch because of pain. Tr. at 192. The record reflects more than 60 medical appointments, ER visits, and hospitalizations over the 26-month period from Plaintiff's alleged onset date through the month prior to the ALJ's decision.

During the hearing, the VE testified that two or more absences per month would prevent an individual from maintaining full-time employment. *See* Tr. at 197. Plaintiff required medical treatment on two or more days during 17 of 26 months. *See* Tr. at 521, 530, and 574 (documenting medical visits on April 1, 9, and 13, 2013); 558, 571, and 606 (indicating ER and medical visits on May 4, 14, and 31, 2013); 634, 689–91, 700, 704,

and 863 (noting medical and ER visits on July 5, 7–9, 17, 26, and 30, 2013); 726 and 768 (showing medical appointments on August 7 and 19, 2013); 718, 778, 809, 833, 857, and 898 (reflecting medical and ER visits on October, 9, 13, 15, 17, and 31, 2013); 887, 909, 915, and 920 (documenting treatment visits on March 3, 11, and 24, 2014); 958 and 1084 (indicating treatment visits on April 7 and 23, 2014); 951, 1022, 1045, and 1048 (noting ER and treatment visits and diagnostic tests on July 1, 27, and 29, 2014); 941, 947, and 1076 (recording medical appointments on August 1, 14, and 29, 2014); 931, 1000, and 1377 (indicating medical and ER visits on September 2, 22, and 28, 2014); 937 and 972 (noting medical and ER visits on October 1 and 11, 2014); 1375 and 1435 (reflecting treatment visits on December 2 and 22, 2014): 1154 and 1191 (showing ER visits on January 2 and 19, 2015); Tr. at 1232, 1267, and 1310 (indicating ER visits on February 5, 13, and 15, 2015); 1337, 1373, 1416, and 1430 (noting ER at treatment visits on March 2, 8, 9, and 18, 2015); 1369 and 1402 (reflecting treatment and ER visits on April 8 and 11, 2015); 1364, 1382, and 1424 (documenting treatment and ER visits on May 1, 2, and 8, 2015).

The ALJ considered the frequency of Plaintiff's ER visits in assessing the severity of his pain (Tr. at 165), but he did not consider whether Plaintiff would be absent from work on a frequent basis because of his medical treatment. The record contains significant evidence to suggest the frequency of Plaintiff's ongoing medical treatment would affect his ability to complete a normal workday and workweek. In light of this evidence, the ALJ erred in failing to address Plaintiff's ability to meet an employer's attendance expectations on a regular and continuing basis.

b.     Effects of Pain and Medications

The ALJ indicated he had evaluated Plaintiff's pain and the side effects of his medications in assessing his RFC. *See* Tr. at 158 (acknowledging that Plaintiff's "physical symptoms may contribute to his anxiety and depression," but finding there was no indication in the record that Plaintiff's combination of impairments "impose[d] greater limitations than those inherent in the residual functional capacity assessment"). He considered Plaintiff's testimony as to the effects of pain and medications on his abilities to focus, concentrate, and attend to tasks. *See* Tr. at 156 (noting that Plaintiff had reported that he was "able to pay attention as long as he is not medicated" and could manage his own finances) and Tr. at 159–60 (citing Plaintiff's indications that he was unable to drive while taking pain medication; that Dilaudid caused him to feel "loopy" and impaired his concentration; and that he could no longer concentrate well enough to play video games or to focus on a television show for longer than 30 minutes).

The ALJ noted that Dr. Culpepper opined that Plaintiff "had stress secondary to pain and multiple disease processes" and gave significant weight to his opinion that Plaintiff "had some mental work-related limitations." Tr. at 161. He stated he had "included the limitations to the performance of simple, routine, repetitive tasks in a low stress environment with no fast paced production or quotas in consideration of Dr. Culpepper's note associating the claimant's work-related limitations to stress." *Id.*

Although Plaintiff maintains that Dr. Culpepper was asserting that he had obvious work-related limitation in function as a result of pain and multiple disease processes (ECF No. 13 at 37), the undersigned notes that the form Dr. Culpepper completed

addressed Plaintiff's "mental condition" and "mental status" (Tr. at 880). In response to the question about work-related limitation in function due to the mental condition, Dr. Culpepper selected "[o]bvious" when presented with options that also included "[s]light," "[s]erious," and "very serious." *See* Tr. at 880. He then commented that Plaintiff experienced "[s]tress 2nd pain and multiple disease processes." In light of Dr. Culpepper's indication that Plaintiff's work-related limitation was more than slight, but less than serious, the form's references to mental condition and status, and Dr. Culpepper's reference to stress, it was not unreasonable for the ALJ to interpret the opinion as one addressing the functional effects of Plaintiff's mental impairments. Furthermore, in the absence of any specific restrictions from Dr. Culpepper that pertained to Plaintiff's abilities to focus, concentrate, and attend to tasks, it was rational for the ALJ to interpret Dr. Culpepper's opinion as being consistent with a finding that Plaintiff's mental impairments restricted him to the performance of simple, routine, repetitive tasks in a low stress environment with no fast paced production or quotas.

As for Plaintiff's argument that the ALJ did not adequately consider the side effects of his medication in assessing his RFC, the ALJ indicated "[t]reatment notes reflect that the claimant denied significant side effects of his pain medications, although his testimony and allegations in connection with this application for benefits suggest that he experienced significant sedation with his medication regimen." Tr. at 163. He concluded that the inconsistencies suggested that the information Plaintiff provided "may not be entirely reliable." *Id.* Thus, the ALJ recognized that the record presented conflicting evidence and relied on substantial evidence to conclude that Plaintiff was not

further limited as a result of side effects from medications. Therefore, the undersigned recommends the court find the ALJ did not err in failing to include additional restrictions in the RFC assessment to address side effects of Plaintiff's medications.

While the ALJ provided valid reasons for his interpretation of the form Dr. Culpepper completed and the evidence regarding side effects of medication, he did not adequately consider the evidence with respect to the effect of Plaintiff's pain on his ability to engage in work activity on a regular and continuing basis. SSR 96-8p, 1996 WL 374184 at *2. The record contains copious evidence that Plaintiff regularly experienced bouts of abdominal pain, nausea, and vomiting that would reasonably be expected to affect his ability to maintain expected job pace and complete tasks. *See, e.g.*, Tr. at 508 (reflecting an ER visit on March 12, 2013); 533 (indicating complaints to Dr. Culpepper on March 20, 2013); 689 (showing a hospitalization from July 7–9, 2013); 1054 (noting a weeklong history of symptoms on July 27, 2014). Although the ALJ argues evidence of "only mild to moderate abdominal tenderness" during physical examinations, normal imaging results, and response to treatment suggest that Plaintiff's pain did not impair him to the extent he alleged (Tr. at 164–65), the undersigned notes that the objective findings and prescribed treatment appear to be consistent with Plaintiff's diagnosis. *See Chronic Pancreatitis*, Medline Plus (Oct. 27, 2015). The ALJ did not specifically consider whether Plaintiff's pain would interfere with his ability to maintain expected job pace and complete job tasks. *See generally* Tr. at 158–66. In light of the evidence of record, the undersigned recommends the court find that the ALJ erred in failing to consider the effect of pain on Plaintiff's capacity to perform relevant functions. *See Mascio*, 780 F.3d at 636.

4.    Credibility

Plaintiff argues the ALJ erred in finding his testimony to be less than fully credible. [ECF No. 13 at 42]. He maintains that the ALJ's assessment of his credibility does not show that he considered the entire record. *Id.* at 43. He contends the ALJ did not evaluate the evidence in light of indications from Plaintiff's physicians that his pain was lifelong, debilitating, severe, chronic, and intractable. *Id.* at 44. He claims the ALJ ignored evidence that suggested he would frequently be absent from work in evaluating his subjective complaints. *Id.* at 44. He maintains that the record did not suggest he was "malingering or exhibiting inappropriate medication-seeking behavior." *Id.* at 44.

The Commissioner argues "[t]he ALJ carefully weighed Plaintiff's subjective symptoms of pain, compared them to Plaintiff's history of pain management and objective findings, and gave a detailed explanation as to why he found Plaintiff not entirely credible." [ECF No. 14 at 19]. She maintains the ALJ cited indications in the record that Plaintiff's pain was managed with medications that caused no significant side effects; physical examinations that showed few physical abnormalities; and his physicians' failure to adjust his pain medication regimen. *Id.* at 20. She contends the ALJ did not entirely discount Plaintiff's complaints, as evidenced by the fact that he credited his reports of factors that exacerbated his pain in reducing the exertional level from light to sedentary. *Id.* at 21.

Pursuant to SSR 96-7p, after finding that a claimant has a medically-determinable impairment that could reasonably be expected to produce his alleged symptoms, an ALJ should evaluate the intensity, persistence, and limiting effects of the claimant's symptoms

to determine the restrictions they impose on his ability to do basic work activities. If the objective medical evidence does not substantiate the claimant's statements about the intensity, persistence, or limiting effects of his symptoms, the ALJ is required to consider the credibility of the statements in light of the entire case record. SSR 96-7p. The ALJ must consider "the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.* In addition to the objective medical evidence, the ALJ should consider the claimant's ADLs; the location, duration, frequency, and intensity of his pain or other symptoms; factors that precipitate and aggravate his symptoms; the type, dosage, effectiveness, and side effects of his medications; treatment, other than medication, he receives or has received; any measures other than treatment and medications he uses or has used to relieve his pain or other symptoms; and any other relevant factors concerning his limitations and restrictions. *Id.*

The ALJ found that claimant's medically determinable impairments could reasonably be expected to cause some of his alleged symptoms, but that his statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. Tr. at 160. The undersigned recommends the court find that because the ALJ erred in evaluating Dr. Martinie's opinion and in considering the vocational implications of frequent medical treatment and reported symptoms, he did not consider Plaintiff's statements in light of the entire record. Furthermore, it will be necessary for

the ALJ to consider Plaintiff's statements in light of the addition of Dr. Roland's opinion and the other new evidence.

III.   Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

November 13, 2017                         Shiva V. Hodges
Columbia, South Carolina              United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).